RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
Office and Post Office Address
60 East 42nd Street, Suite 1750
New York, New York  10165
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KAREN BARRETT,                                                                  10 CV 4600 (AKH)

                               Plaintiff,                                    **PLAINTIFF'S**
                                                                                        **STATEMENT**
               -against-                                       **PURSUANT TO**
                                                                                        **LOCAL RULE 56.1**

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                               Defendant
-----------------------------------------------------------------X

        Plaintiff, by her attorneys, Riemer & Associates LLC, as and for a statement pursuant to Local Rule 56.1 contends that there is no genuine issue to be tried with respect to the following material facts as follows:

**Background Information**

        1.     Plaintiff was employed as a Director of Business Development/Executive Producer at Moving Images NY LLC ("MI Post"), a subsidiary of Greystone & Co., Inc. & Affiliates ("Greystone").  (00421)

        2.     Plaintiff was insured under a group long term disability plan (the "Plan") offered to qualified employees of MI Post and Greystone.  The benefits under this Plan were provided by Hartford policy #675462. (00067).

        3.     Plaintiff began working at MI Post on August 1, 2007, and was covered by long term disability insurance on September 1, 2007. (00067).

    4.      Shortly after beginning to work at MI Post, Plaintiff was exposed to Volatile Organic Compounds (VOCs) at the office of MIPost and started to have serious health issues. (0216).

    5.      On August 15, 2007, Plaintiff consulted with Dr. Morton M. Teich, an Allergist and Doctor of Environmental Medicine about several physical symptoms she was experiencing including heart palpitations, tightness and cramping in her chest, headaches, burning and redness in her eyes, lip and hand swelling, dizziness, and a rash on her upper body. (0285).

    6.      Dr. Teich believed those adverse reactions were due to the printing chemicals in the air that were emanating from the industrial printing company occupying 3 floors directly her offices at MI Post. (00285).

    7.      The air quality reports and the testing completed in November 2008, February 2008, and November 2004 found VOCs. (00227-00267).

    8.      The New York City Department of Health and Mental Hygiene, Division of Environmental Health issued a summons for chemical odors found on the 6th floor, with no noted exhaust ventilation on the 5th floor, especially noting the area where Plaintiff's office was located, as detailed on the Inspection Report and Notice of Violation. (00236-00237).

    9.      Plaintiff attempted to make modifications within her control (changing her office location several times and purchasing a number of different air filters) but they did not help to alleviate the situation. (00215).

    10.      Plaintiff continued to come into the office as much as she could, which was a good deal of the time, until she got to the point when even the briefest exposure in

the office made her extremely sick. She became unable to tolerate any level of exposure at MI Post at all. (00218).

11. As Plaintiff's condition worsened, she was instructed by her doctor to avoid the chemical exposure. Her direct supervisor, Eric Bertrand, permitted her to work at home as much as it was feasible to do so, and still fulfill her job responsibilities. (00211).

12. However, to be effective in her position, Plaintiff needed to be present in the facility the majority of the time, and the Director position could not be performed successfully from home. (211).

**Plaintiff's Application for LTD and Hartford's Denial**

13. Plaintiff stopped working for MI Post on March 17, 2009. (209).

14. On or about April 7, 2009, Greystone sold MI Post. As a result of the transaction, all employees of MI Post, including plaintiff were terminated. (070).

15. By letter from her attorney dated July 10, 2009, Plaintiff applied for long-term disability ("LTD") benefits based on a diagnosis of multiple chemical sensitivities and reactive airway disease, including tightness and cramping of the chest, headaches, burning and redness in the eyes, lip and hand swelling, dizziness, rash on the upper body, and heart palpitations. (412-425).

16. As part of her application for LTD benefits, an Attending Physician's Statement was completed by Dr. Michael B. Lax. (401-405).

17. Dr. Lax is the Medical Director of the Central New York Occupational Health Clinical Center (CNYOHCC), a publicly funded multidisciplinary staffed occupational health clinic. It was established through a New York State Department of

Health grant awarded to SUNY Upstate Medical University through the Department of Family Medicine, and is one of eight occupational health clinical centers of the New York State Occupational Health Clinic Network.  (179).

18.     In his narrative report dated April 7, 2009, Dr. Michael Lax reported that Plaintiff initially presented with complaints of multiple chemical sensitivities, including a chemical taste in the mouth, throat closing, difficulty breathing, burning sensations of the lips, and feelings of being "drugged up," after being exposed to chemicals at the workplace.  (318).

19.     In addition, Plaintiff reported experiencing side effects to the medications that were prescribed to her.  Dr. Lax diagnosed multiple chemical sensitivities, and restricted her from environments from materials and environments known to exacerbate her symptoms. (318-319)

20.     Dr. Lax's report confirmed the diagnosis of multiple chemical sensitivities:

> She meets the diagnostic criteria including symptoms occurring in multiple organ systems, symptoms occurring with multiple low level exposures, normal physical examination (except for the mitral valve prolapse), and previous evaluation by other physicians, and lack of any other diagnosis that would explain part or all of the patient's symptoms. Treatment for this condition was discussed with the patient and would include avoidance of materials and environments known to exacerbate the patient's symptoms.  (319).

21.     By letter dated July 21, 2009, Hartford denied plaintiff's claim on the basis of her alleged receipt of her full wages through April 7, 2009, and her employer's sale of the company on April 7, 2009. (201 – 204).

22. Hartford's denial was based solely upon its contention that plaintiff's claim file "does not show that she experienced an income loss as a result of her illness during the period prior to the date her LTD coverage with Greystone & Co., Inc. & Affiliates terminated on 04/07/2009." (203).

23. Hartford's contention that plaintiff did not experience an income loss as a result of her illness appears to be based upon a letter, dated April 28, 2009, from Jody McClanahan, Director of Human Resources at Greystone, to Hartford, stating that McClanahan had been informed by Naomi Blecker, MI Post's Controller, that plaintiff had been working from home during the period of March 18, 2009 through April 6, 2009, and that she had received her full pay. (090).

**Plaintiff's Request for Clarification of the Reason(s) for Denial**

24. On July 29, 2009, counsel for Barrett wrote Hartford requesting a more complete explanation of the reasons for denial. The letter provides:

> …Ms. Barrett requests a fuller explanation of the reasons for denial. The denial letter does not adequately describe the specific reasons for denial as required by 29 C.F.R. 2560.503-1(f)(l). *See, New Times Long Term Disability Plan*, 2004 U.S. Dist. LEXIS 1259 (S.D.N.Y. Jan. 27, 2004). Most specifically, the denial letter does not adequately explain what medical evidence needs to be provided to establish disability under the plan. In order to assure that Barrett is provided with a full and fair review as required by ERISA 503, please specifically describe:
>
> a. The specific type of objective evidence (e.g., MRI, x-ray, laboratory results, etc.) that Ms. Barrett should provide in order to adequately support her appeal;
>
> b. The specific opinion evidence that Ms. Barrett should provide in order to adequately support her appeal;
>
> c. The specific clinical findings that Ms. Barrett should provide in order to adequately support her appeal;

> d. The specific type of evidence that Ms. Barrett must submit to adequately support her claims of fatigue and/or pain.
>
> In other words, given Ms. Barrett's disability and the terms of the Plan, please tell Ms. Barrett what specifically she must submit in order to demonstrate total disability under the Plan.

(381-382).

25. Instead of providing responses to these questions, Hartford ignored them providing no additional clarification. Hartford responded to the letter only by providing a copy of the claim file, which included no medical review of the evidence. (198).

**Plaintiff Appeal of LTD Benefit Denial**

26. By letter dated January 13, 2010, Plaintiff appealed the denial of her long term disability benefits. (00168 – 00181).

27. The appeal letter also included one last attempt to ensure a full and fair review. The letter provides:

> **Please be advised if Hartford has Ms. Barrett's evidence reviewed by a medical and/or vocational professional, Ms. Barrett hereby requests the opportunity to respond to such report prior to Hartford's final determination. Please consider this a formal request for any report issued by such a medical and/or vocational professional and a request for his or her current curriculum vitae.**

(181)(bold in original).

28. The appeal letter addressed the issue of Plaintiff's income loss by including two letters, from Eric Bertrand, General Manager of MI Post ("Bertrand"), and Naomi Becker. These letters clarified that plaintiff was not working from home during that period, and that she was only marked "present" on the company's attendance sheets, because Blecker believed that plaintiff was eligible for and was participating in "Greystone's private, full-pay, short term disability." (00209-00212).

29. Plaintiff, therefore, received no wages for any work during the March 18, 2009 through April 6, 2009 period. (00209).

30. Subsequent to the onset of her disability, plaintiff continued to see numerous physicians, who all documented her worsening condition and increasing multiple chemical sensitivities. (168-170).

31. As part of her appeal, plaintiff also submitted medical reports from five different physicians, all of whom confirmed that she had multiple chemical sensitivities ("MCS") and objective symptoms from the MCS disable plaintiff from performing the required job duties of her occupation. (268-378).

32. Dr. Aboaba Afilaka was the first doctor Plaintiff consulted when she began to have physical reactions to her work environment in 2005. Dr. Afilaka is an Assistant Professor, Preventative Medicine at the Mount Sinai – Irving J. Selikoff Center for Occupational and Environmental Medicine (COEM) in New York City. A leader in its field, the COEM is internationally known as a Center of Excellence in the diagnosis, treatment, and prevention of work-related illness and disease. (175-176).

33. Plaintiff initially presented to Dr. Afilaka on January 3, 2005 with complaints of progressively worsening chest tightness, palpitations, dyspnea, "metallic" taste, throat irritation and hoarseness, and lesions along the upper gum. On examination, Dr. Afilaka found red, swollen interior turbinates of the mouth and diagnosed volatile organic compound, hydrocarbon airway reactive disease. Dr. Afilaka further recommended pulmonary function testing. A pulmonary function test completed on January 20, 2005 demonstrated minimally reduced mid-force expiratory flow. (175).

34.     Plaintiff returned to Dr. Afilaka on March 21, 2005 with continued complaints of dyspnea, chest tightness, and palpitations.  Dr. Afilaka diagnosed solvent induced reactive airway disease and rhino sinusitis.   Medical records dated October 24, 2007 significantly note continued symptoms, despite the use of special chemical filters in the workplace. (175-176).

35.     On January 14, 2009, Barrett reported complaints that even shopping in the detergent aisle or perfume aisle at shopping marts produced palpitations.  Dr. Afilaka reaffirmed the prior diagnosis of reactive airway disease.  (176).

36.     Plaintiff returned on September 9, 2009 with continued complaints of shortness of breath, palpitations, tremulousness, fatigue and chest tightness due to exposure to volatile organic compounds at the workplace. (175-176).

37.     In a report, dated on or about September 9, 2009, plaintiff's treating physician, Dr. Aboaba Afilaka, noted plaintiff's "progressively worsening symptoms" and that

> [w]ith time she has become very sensitive to minute irritants, such as particulates, solvents, VOC's [i.e., Volatile Organic Compounds] emanating from carpets, plastics, rubbers, office equipments, air freshener, cleaning agents, fabric detergent, fabric softener and even personal fragrances (perfumes and cologne).
> Thereafter, when exposed to areas where such items, as listed above, are present, she has intense reactions wherein breathing becomes very uncomfortable, she becomes short of breath and experiences tightness in her chest.
>
> She experiences palpitations, for up to 24 hours after exposure, and at other times longer, to any of the items listed above.
> (268-269).

38.     When Plaintiff continued to experience adverse reactions to her work environment, she consulted Dr. Morton Teich, a specialist in clinical immunology at

Mount Sinai.  Dr. Teich is also a clinical instructor of Medicine, Clinical Immunology and a Past President of the American Academy of Environmental Medicine.  The American Academy of Environmental Medicine was founded in 1965, and is an international association of physicians and other professionals interested in the clinical aspects of humans and their environment. (176-177).

        39.      Dr. Teich has treated Plaintiff throughout the course of her illness, including the various ways she tried to ameliorate her condition.  In his report dated January 2, 2008, Dr. Teich documented the serious effects that the exposure to a toxic environment have had upon Plaintiff's ability to function, saying, "her exposure to that environment is triggering her symptoms and it is likely that further exposure could possibly create a permanent disability." (288).

        40.      In a report, dated on or about April 15, 2009, Dr. Teich described the progression of Plaintiff's illness, when he wrote:

> Initially she became sensitized to a variety of chemicals in her daily routine specifically found in the building where she worked.  When removed from that environment she basically cleared of all her symptoms.  On return to that environment, all her symptoms returned with a vengeance within a few hours.  *I observed these in my office*.  In the past several months, however, [Plaintiff] now *has become sensitized to the chemicals found not just in her own office but also found in most office environments.*  Earlier this year, after a period of de-sensitization, where she avoided going into her office, she went into a secondary office of her company.  Within a very short period of time, she began to feel significant symptoms and had to leave the building.
>
> In my professional opinion, the de-sensitization she attempted earlier in the year was not of sufficient duration.  In an effort to prevent her symptoms from becoming chronic and creating a permanent disability, she needs to undergo an extended period of de-sensitization (months not weeks) where she avoids exposure to the chemicals found in office environments.  Plaintiff, therefore, *is presently disabled from any job in which she must work in an office environment.* (emphasis added).  (287).

39.     Later, in another report, dated on or about September 3, 2009, Dr. Teich wrote:

> Plaintiff is greatly limited by her present symptoms.  She can only work at a reduced capacity in a job where she could avoid exposure to an office environment.  ***She is presently total disabled from any job in an office environment.***  (emphasis added).  (285).

40.     Desperate to remedy her worsening conditions, Plaintiff also sought the advice of Dr. Adrienne Sprouse.  Dr. Sprouse, like all of Plaintiff's physicians, is an expert in the field of MCS.  Dr. Adrienne Sprouse is a graduate of Columbia College of Physicians and Surgeons in New York City.  She currently serves as Medical Director for Manhattan Health Consultants, a chemical-free Environmental Medicine Center in New York City. (179-180).

41.     In a statement dated August 20, 2009, Dr. Sprouse reported that Plaintiff suffers from multiple serious and life threatening angioedema[s] when exposed to levels of chemicals that are present in most work places including, but not limited to, solvents, hairsprays, photocopier fumes, nail polish, new carpeting, and solvents.  (322).

42.     Dr. Sprouse opined that Plaintiff is "permanently disabled with the diagnosis of angioedema, reactive airway disease, dizziness, cardiac palpitations, and chemical sensitivity," with a guarded prognosis.  Dr. Sprouse further opined that Plaintiff "will not be able to work in any typical work places where any of the above chemical compounds are present," and that she must "…undergo treatment and recover from multiple debilitating symptoms before any work activity can be attempted." (322).

43.     Plaintiff also consulted another renowned expert in the field of chemical injury and MCS, Dr. Grace Ziem, M.D.  Dr. Ziem has been practicing medicine for 38

years, with a major focus on public health and prevention as well as medical care. She has a Master of Public Health from Johns Hopkins (1971), and a Master of Science and then Doctor of Public Health from Harvard (1975). (179-180)

44. Dr. Ziem noted:

> Karen Barrett has very significant reactive airway disease (506.4.). This completely impairs her ability to work around any irritants, even at low does. ***This is considered a permanent condition*** that will require ongoing reduction of irritants in her environment. (emphasis added). (295).

45. In the controlled environment of Dr. Ziem's medical office, plaintiff's multiple chemical sensitivities were objectively measured:

> Using an independent instrument developed at the Robert Wood Johnson Medical College of New Jersey, [plaintiff] had symptom exacerbation with numerous commonly used products that had not affected her prior to her [employer's office] exposure. These include respiratory irritants in products such as various cleaning agents, vehicle exhaust, numerous scented products, various glues and adhesives, numerous paint and paint products, new carpeting, and nail polish remover. (294).

**Hartford's Denial of the Appeal**

46. On or about March 12, 2010, Hartford upheld its denial of plaintiff's benefits, opining that it was still possible for her to work in other work environments without experiencing symptoms. (082).

47. Hartford stated that in making its claim determination it had relied upon the "coordinated" medical review of Dr. Philip Adamo and Dr. Ira Krefting of University Disability Consortium ("UDC"). (079).

48. There is no evidence that Dr. Adamo is a specialist familiar with the diagnosis of MCS. (153).

49. To conduct the review of Barrett's medical records, Dr. Adamo needed to consult secondary sources for guidance. Dr. Adamo's report referred to "peer reviewed resources" that he refers to when reviewing a case with the diagnosis of MCS. (152).

50. Dr. Adamo's review is biased because he expressed his belief that MCS is not a real illness, but rather individuals allegedly suffering from it in actuality have a psychosomatic disorder.

51. Dr. Adamo cites to an article from *Occupational Medicine: State of the Art Reviews,* published in 2000, which states that "there is no established and widely available test to diagnose IEI or MCS" and suggests that IEI/MCS is "strongly associated with psychiatric co-morbidity." (152).

52. Dr. Adamo also quoted from a "recent article" titled "Multiple Chemical Sensitivity: A Spurious Diagnosis" that suggested that people with MCS "have a psychosomatic disorder in which they develop multiple symptoms in response to stress." (153).

53. Dr. Adamo also demonstrated a bias against a diagnosis of RADS (reactive airways dysfunction syndrome), which he believes from a conversation with Dr. Krefting is not accepted by all mainstream pulmonologists. (150).

54. Dr. Adamo claimed that he tried to contact Dr. Afilaka over three days, but his report documents his attempts to contact a "Dr. Aphelia." (149).

55. Dr. Adamo claimed that he spoke with Dr. Lax, who confirmed that it was his opinion that Plaintiff had MCS. (150).

56. Nevertheless, Dr. Adamo stated that there was "no evidence to support RADS or multiple chemical sensitivity." (151).

57.     Dr. Krefting reviewed the medical records submitted with the appeal from a "pulmonary medicine standpoint," but there is no evidence that Dr. Krefting is a specialist familiar with the diagnosis of MCS. (154, 158).

58.     Dr. Krefting is biased because his opinion is that RADS is not a diagnosis accepted by mainstream pulmonologists.  (150).

59.     Dr. Krefting set up a catch-22 situation for the Plaintiff, stating, "The claimant has not had a methacholine challenge pulmonary test which can help diagnosis RADS; claimants with possible RADS are often told not to have this test which may cause worsening of symptoms." (157).

60.     Hartford stated that Dr. Adamo and Dr. Krefting had concluded that plaintiff had "no observable findings to support an incapacitating diagnosis or impairment," and that plaintiff's "symptoms have not been professionally observed." (081).

61.     Drs. Adamo and Krefting, however, have overlooked the significant objective evidence establishing Barrett's diagnoses and the fact that her symptoms were clinically observed by her treating physicians, as evidenced in their treatment notes and reports.  (268-69, 270, 271, 272-73, 276-77, 280, 281-82, 285, 287, 288, 291-95, 300, 318, 320, 323, 329, 332, 351-52).

**Plaintiff Has Continued to Work at Home in a Lesser Capacity**

62.     Plaintiff has continued to work despite her symptoms in a much lower capacity and salary.  In or about May 2009, MI Post, now a separate entity from Greystone, hired plaintiff as a Sales Representative.  (211).

63. The occupation of Sales Representative was an inferior and lower paying occupation than plaintiff's previous occupation as Director of Business Development/Executive Producer. Because of her years of service and reputation, MI Post permitted plaintiff as an accommodation to work completely from home and never required her to be in the office at all. (211).

64. Plaintiff has complied with and exhausted all administrative appeals under the Plan. (138).

**Hartford's Conflict of Interest**

65. At all relevant times, Hartford has been operating under an inherent and structural conflict of interest because, on the one hand, Hartford is liable for benefit payments due to plaintiff and, on the other hand, each such payment depletes Hartford's assets.

**Hartford's Cozy Relationship with UDC**

66. In the past, Hartford extensively utilized the services of UDC. In 2005, UDC performed 2,517 medical record reviews on behalf of Hartford, charging $3,558.187. In 2006, UDC performed 1,774 medical record reviews on behalf of Hartford, charging $2,515,168. In 2007, UDC performed 893 medical record reviews on behalf of Hartford, charging $1,272,128. (Answer ¶45).

67. Hartford continued to extensively use UDC during the timeframes of this case. In 2008, UDC performed 847 medical record reviews on behalf of Hartford, charging $1,235,995.00. In 2009, UDC performed 967 medical record reviews on behalf of Hartford, charging $1,476,633.75. (Interrogatory Response ¶7).

68. In the past, as well as in this case, Hartford utilized the services of UDC, to whom Hartford has paid over $13 million for review services over approximately four years. "It follows that Hartford knows that UDC has an incentive to provide it with reports that will increase the chances that Hartford will return to UDC in the future--in other words, reports upon which Hartford may rely in justifying its decision to deny benefits to a Plan participant." *Caplan v. CNA Financial Corp.*, 544 F.Supp.2d 984, 991-92 (C.D. Cal. 2008).

69. UDC "is a company that, as of 2006, derived nearly three quarters of its revenue from defendant" Hartford. *Jacoby v. Hartford Life and Acc. Ins. Co.*, 2008 WL 4361256, *1 (S.D.N.Y., September 24, 2008).

70. Hartford's selection of a medical review companies such UDC in this case shows that Hartford does not try to fairly and accurately evaluate claims, but instead that it selects medical review companies and their doctors who will provide expected results, i.e., a finding that the insured is not impaired.

Dated: New York, New York
March 25, 2011

                                      RIEMER & ASSOCIATES LLC
                                      Attorneys for Plaintiff
                                      60 East 42nd Street, Suite 1750
                                      New York, New York 10165
                                      (212) 297-0700


                                      By:_____/s/_____
                                        Scott M. Riemer (SR5005)

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on March 29, 2011 I served a true and complete copy of the foregoing 56.1 Statement by transmitting the same by electronic mail to the following individuals at the e-mail addresses indicated:

Michael H. Bernstein, Esq.
Sedgwick Detert Moran & Arnold LLP
125 Broad Street, 39th Floor
New York, New York 10004-2400
Tel.: (212) 422-0202
Fax: (212) 422-0925
*Attorneys for Defendant*


I also certify that this document filed through the ECF system will be sent electronically to all  registered participants on March 29, 2011.

Dated: New York, New York
          March 29, 2011


                                        /s/Scott M. Riemer
                                        Scott M. Riemer (SR5005)